**FILED**

OCT - 1 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOS

UNITED STATES OF AMERICA   )

v.   )

ROBERT DEKELAITA   )

1:18-cv-06682
Judge Matthew F. Kennelly
Magistrate Judge Maria Valdez
(14cr497-1)

Judge Matthew F. Kennelly

## Memorandum in support of Motion to Vacate, Set Aside, or Correct a Sentence By a Person in Federal Custody (Motion Under 28 U.S.C. § 2255)

### I.    INTRODUCTION

After a multiple-count indictment was brought against DeKelaita in September of 2014, and two other superseding indictments were issued, a five-count indictment was finally put before this Court and the jury in April of 2016. The jury acquitted DeKelaita of the last count, which alleged he was involved in marriage fraud. It also largely gutted counts 2, 3, and 4 of most of their content, but allowed them to stand on one alleged false statement. Count one, involving an "overarching conspiracy", was allowed to stand. After DeKelaita filed a Petition for Acquittal, this Court vacated counts 2, 3, and 4, but, after noting it was a "close-call," upheld Count One.

DeKelaita appealed the court's final decision to the 7th Circuit Court of Appeals. The U.S. Attorney's office also appealed to the 7th Circuit, but then withdrew its appeal. The Appellate Court affirmed this Court's decision. DeKelaita then filed a Petition for Rehearing. This was denied on January 25, 2018.

1

In 2008, the Prosecution's Department of Homeland Security (DHS) agents initiated an investigation of DeKelaita. The agents interviewed, interrogated, and recorded numerous former clients. In September of 2014, the Prosecution's indictment was essentially based on former clients and two informants, most notably Rafal Khizme and Fadhil Rasho. The former clients admitted lying to obtain immigration benefits in the form of asylum. Years after admitting to false applications, those who became witnesses kept their admittedly fraudulent immigration status and remain in the United States, contrary to what the Law clearly requires. Though the Prosecution may assert that the witnesses kept their immigration benefits in the form of legal immigration status because they may have been needed for further testimony, the fact is that each witness could have remained in the United States but deprived of his or her immigration status. In other words, allowing the witnesses to keep their immigration status, which is a benefit given to them, was completely unnecessary for the purpose of testifying at trial at some point in the future. The witnesses could have had their deportations stayed or could have been given Withholding of Removal if in fact "no benefit" was to be given to them.

For the reasons outlined and argued below, and because the passage of time has allowed for a more complete picture of the Prosecution's methods and what transpired in Court, this Court should now vacate Count One and grant the Petitioner the necessary relief.

## II.    STATEMENT OF JURISDICTION

DeKelaita is timely filing a Motion to Vacate, set aside, or correct a sentence by a person in federal custody pursuant to 28 U.S.C. Sec. 2255 ("2255 Motion"), along with

this memorandum of law. Jurisdiction is vested in the Court that presided over and imposed the sentence in this matter. In this case the judgement became final when the Court of Appeals denied DeKelaita's Petition for Rehearing on January 25, 2018.

### III. GROUNDS UPON WHICH PETITION IS BASED

1. Witnesses that testified at trial were rewarded for their testimony by being allowed to retain their admittedly fraudulent/frivolous Asylum Status. However, the jury was unaware of such reward of immigration status, and further unaware that such reward was contrary to law. Despite testifying they obtained "no benefit" in return for their testimony in court, the facts show that the witnesses received no consequences for their admitted immigration fraud. Undisclosed benefits given to witnesses violated due process rights to a fair trial.

2. Confidential Informant (CI) Fadhil Rasho failed to testify in court and was not subjected to cross-examination, yet his selective statements were introduced before the jury, contrary to DeKelaita's fundamental constitutional right to a fair trial. Rasho lied to DeKelaita about his asylum claim at the direction of the Office of the Inspector General (O.I.G) of the Department of Homeland Security (D.H.S.) by telling DeKelaita that the statement prepared for him was correct, and was allowed to file - according to the Prosecution - a frivolous asylum application and subsequently withdraw it. Finally he was awarded asylum status, all in violation of the very laws the Prosecution alleged DeKelaita violated. Rasho's calculated absence deprived DeKelaita of critical information for a fair trial.

3. The Prosecution's case against "Attorneys A & B", according to its indictment and presentation before the jury, labeling the two as co-conspirators, is undermined by their

3

non-prosecution by the administrative bodies-both the Attorney Registration and Disciplinary Commission (ARDC), and the Executive Office for Immigration Review (EOIR)-and demonstrates the non-existence of the alleged overarching conspiracy.

### GROUND 1

*Witnesses that testified at trial were rewarded for their testimony by being allowed to retain their admittedly fraudulent/frivolous Asylum Status. However, the jury was unaware of such reward of immigration status, and further unaware that such reward was contrary to law. Despite testifying they obtained "no benefit" in return for their testimony in court, the facts show that the witnesses received no consequences for their admitted immigration fraud. Undisclosed benefits given to witnesses violated due process rights to a fair trial.*

This was a case about truth telling or the lack of it. At the heart of the Prosecution's case was that the asylum cases of the witnesses contained material and willful lies and misstatements, such that their asylum applications were fraudulent or frivolous. The definition of a frivolous asylum application is that it contains "willful material misrepresentations." See 8 U.S.C. Sec. 1158 (d) (6). The misrepresentations must be willful or intentional, and material. Materiality is defined as the "ability to sway the decision-maker" and hence the outcome of the case. [1]

The jury would have been entitled to know of any benefit a witness received for testimony, because it might have changed the weight the jury afforded each witness's testimony. Not disclosing these benefits to the jury violated DeKelaita's right to a fair trial. Therefore, the count I conviction should be vacated.

The consequences of filing a frivolous asylum application are severe; the applicant must be barred from any benefit whatsoever under the Immigration & Nationality Act (INA). The bar is permanent. 8 U.S.C Sec. 1158 (d) (6); 8 C.F.R. Sec 1208. Matter of X-MC, 25 I&N Dec. 322 (BIA 2010); Matter of B-Y-, 25 I&N Dec. 236 (BIA 2010). Once

---

[1] Every applicant is warned about the consequences of filing a frivolous asylum application. See 8 U.S.C 1158 (d) (4) (A).

an applicant is barred from any benefit under the INA, the applicant will be ordered deported from the United States, unless the applicant qualifies for only one form of relief: Withholding of Removal. Withholding of Removal allows an applicant to remain the United States if his life or liberty are in danger. [2] However, such alien will never be allowed to have any formal legal immigration status or other form of relief based on previously having filed a frivolous asylum application. Pavlov v. Holder, 697 F.3d 616 (7th Cir. 2012).

In this case, the Prosecution argued that DeKelaita filed applications that contained materially false representations for the witnesses that testified. DeKelaita maintained his innocence and continues to do so. The witnesses each testified that they willfully lied and that their lies were material, which rendered their applications frivolous. A frivolous application is not excused even if someone else assisted in completing it. Pavlov v. Holder, 697 F.3d 616, (7th Cir. 2012). Thus the legal consequences for the witnesses under the immigration laws do not change even if they point the finger at their attorney.

Each of the witnesses were concerned with their immigration status and they testified as such during the trial. While they testified that they received no assurances regarding that immigration status, time has clearly demonstrated that none of the witnesses that testified at trial received the appropriate legal consequences for their admitted immigration fraud. This amounts to a benefit for their testimony, and that benefit was not disclosed to the jury. [3]

---

[2] Withholding of Removal under INA 241(b)(3)
[3] No witness that testified for the government at trial has been placed in removal proceedings, or had their immigration status revoked – contrary to the clearly established policies and procedures of the INA. Conversely,

It is certain that the applications of the various witnesses were in fact frivolous. Each witness admitted this under oath. The Prosecution's allegation was that material, willful and intentional lies were told by the witnesses in connection with their asylum applications. The final argument of the Prosecution said correctly:

*"...they did lie. They lied on their asylum applications. They lied under oath at immigration hearings...They did lie. They willingly told lies"* (-TR. P. 1822)

If they "lied", and clearly admitted to their frivolous applications, the DHS could only rescind their asylum status, and any subsequent benefits obtained and then place them in deportation proceedings. The Immigration Court, the proper court to adjudicate a frivolous case, would grant a full hearing and the witnesses would have to testify on their own behalf and to admit what they admitted in this Court, namely that they had filed a frivolous asylum application and then testified to it be true under oath. The court would then strip them of their immigration status and order them deported. This is what the Law requires.

However, in the case of Rafal Khizme, the contrary happened. She was in deportation proceedings, at the time she testified before this Court, but such proceedings were recently terminated, allowing her to remain in the United States, and to obtain an immigration benefit the law does not entitle her to obtain. 8 U.S.C 1158(d)(4)(A).[4] If in fact Khizme received no benefit for her testimony, she had to be ordered deported by the Immigration Court and not to have her deportation terminated.

---

clients of DeKelaita who did not testify for the government at trial have not been able to obtain immigration benefits, as their applications have been placed on hold.

[4] One can obtain the necessary information by dialing 1-800-898-7180, and entering Rafal Khizme's A number

Not only was there a clear benefit in connection with the testimony of the witnesses, but keeping the witnesses from testifying in immigration court also means that they are not required to provide testimony regarding their own fraud. That would be messy business. Would he or she be consistent with what was said at trial or would their testimony have changed? What did Khizme say?

In this Court, Khizme testified explicitly that she received no promises in exchange for her testimony and did not expect any assistance from the Prosecution (TR, p.657). How could Khizme be so confident? Not only had she clearly testified to filing at least one frivolous asylum application, she also confirmed that she entered the United States illegally, using her sister's U.S. passport (TR. p. 658). Additionally, Khizme admitted she could have been prosecuted criminally for entering the United States through a false U.S. Passport, but was not.

> *Q. Murphy: You could get five years in prison for that; is that correct?*
>
> *A. Khizme: Now I know sir.*
>
> *Q. Murphy: So could your sister?*
>
> *A. Khizme: Now I know sir.*
>
> *(TR, p. 659)*

The record shows that Khizme was not prosecuted criminally. She admitted to breaking the law, but received no consequences for her actions and even obtained an immigration benefit after her testimony. The jury and this Court should have therefore been informed of this benefit, as it may have factored into the weight and credibility given to her testimony.

Khizme was asked at trial if she would be deported from the United States, because she had no possible form of relief, having filed what she admitted was a frivolous asylum application.

> Q. Murphy: And your testimony…is that you have status in the United States until I believe its May 5th of this year….
>
> A.    Khizme: What kind of status you mean?
>
> Q.  Murphy: Well, on May 5th 2016, Unless the government does something for your, are you going to be deported or excluded?
>
> A. Khizme: My permission or my authorization will expire in May 5th, and that's what I have.
>
> Q. Murphy: Then you are going back to Ecuador; is that correct?
>
> A. Khizme: I don't know.
>
> Q. Murphy: Unless what?
>
> A. Khizme: My husband is a citizen, and he applied for me.
>
> Q. Murphy: Now, you haven't gotten any promises from the government, have you?
>
> A.   Khizme: No sir.
>
> (TR. p. 659-660)

The passage of time has proven that Khizme lied in Court.  She knew that having filed a frivolous asylum application, as she admitted doing, would have clearly barred her from any type of relief-even if her husband had applied for her. An alien is "permanently ineligible for any benefit under the act." 8 U.S.C. 1158 (d) (6). The immigration law is crystal clear. Khizme cannot be entitled to any form of relief, and certainly not the termination of her deportation proceedings. Had she obtained no reward from the

Prosecution, she would have been ordered deported by the Immigration Court. The 7th Circuit in <u>Pavlov v. Holder</u> made this point emphatically, when it noted that "1158 (d) (6) prescribes adverse consequences when an alien has knowingly made a frivolous application for asylum." (Pavlov v. Holder, 697 F.3.d 616,618) (7th Cir 2012) The court barred Pavlov from any type of relief including adjustment of status through his wife, who was an American citizen. And even though Pavlov never testified before a court about his asylum application, the mere filing of a frivolous application barred him from any relief permanently. Khizme went one better than Pavlov. She actually testified very emotionally in Immigration Court about her asylum application, kept that application pending, and actually filed an additional application for asylum that was also frivolous. [5] She was fully aware of the Law by the time she testified before this Court:

> *Q. Murphy: ......One of the places that you signed [on the application]*
> *Says that could lose any subsequent immigration benefits you could ever receive?*
>
> *A. Khizme: Right.*
>
> *Q. Murphy: In other words, you could be excluded from the country?*
>
> *A. Khizme: Yes sir.*
>
> *Q. Murphy: And you couldn't get a green card?*
>
> *A. Khizme: Yes sir*
>
> *Q. Murphy: Nor could you get your citizenship?*
>
> *A. Khizme: I understand......*
>
> *(TR. p 662)*

---

[5] Khizme filed a second frivolous asylum case, but Prosecution claims at their direction ( See TR  p. 692)

Khizme did "understand". Her explanation, then, as to her obtaining no benefit therefore is unreasonable.[6]

According to Khizme, sometime in 2006, she went to an immigration attorney (Tr. p. 685). She allegedly told the attorney "the lies need to be stopped." (Tr. p. 685). She then met with agents of the Department of Homeland Security, Office of Inspector General (DHS-OIG), Mr. Shoudy and then Mr. Chesla, most likely through this attorney. Tellingly, she instructed her attorney, "I need a solution to fix my paper…" (Tr. p. 686). Now an immigration attorney is clearly able to determine that Ms. Khizme cannot qualify, having filed a frivolous asylum application, to "any benefit" under the immigration laws. 8 U.S.C 1158 (d) (6). There was simply no "solution to fix" her "paper." Furthermore, both agents who dealt with her, Mr. Chesla and Mr. Shoudy, were no doubt aware of the law, having worked at the Department of Homeland Security, to know that Ms. Khizme could not, under any circumstances, obtain "any benefit." The Prosecution rewarded Ms. Khizme nevertheless, who on the one hand seems to "understand" that she cannot qualify for any benefit, but then has her husband qualify her for adjustment of status when the law does not allow it. (Tr. p. 660) It is unreasonable to think that Ms. Khizme did not know that she was obtaining a benefit, contrary to the law. What did the agents know if this was the case? The jury did not know about any of the possible deals being made. And such information, relevant to the determination of a witness's motivation to testify, especially in the case of a witness who admits to having perjured herself repeatedly, was important and material to be placed before the jury. When DeKelaita reported to prison, the Immigration Judge terminated Ms. Khizme's

---

[6] *Murphy: You told so many lies, you can't remember all of them?*
   *Khizme: Definitely.* (Tr. p 679)

deportation proceedings.[7] If the law concerning "no benefit" under the Immigration Act is to be upheld and respected, and this case about truth-telling be fairly adjudicated, the jury should have been made aware of the agreement between Khizme and her handlers.

Thus, in the case of Khizme, no reasonable person could believe that no agreement was made when the Law requires the DHS to act on admitted fraud and it does not, all the while the Prosecution and witnesses claim that no benefit was expected or provided to those very witnesses who testified at trial at having filed frivolous asylum applications.

Nahal Najam, and his brother, Hilal Albqal, were also rewarded. Both testified coming from Mosul, Iraq, at a time when Iraq's Christian community was being decimated by severe persecution. Najam was particularly interesting. In downplaying the conditions he faced that were dangerous, and in vacillating between being threatened on the one hand, and then removing himself out of the danger when it suited his testimony, he seemed to be following a script. This was so, incredibly when he admitted he was a Christian, the situation in Iraq was dangerous, he and his partner were threatened, his store or place of business was bombed, and his partner or friend killed. (TR, p. 892). For example, he was reluctant to admit to being threatened, but then confessed:

> *"they daily used to call and threaten us." (Tr. p. 918)*

Najam's testimony lacks creditability to the extent that 'no reasonable juror' should have given it any weight.[8] He essentially admitted to asylum fraud (TR. p. 844-848), and on cross, admitted to fiancé fraud (TR. P. 866, 867, 874, 877).

---

[7] This Honorable Court sentenced DeKelaita to serve on January 25, 2018.

Agent Chesla first interviewed Najam on April 30, 2013. At that time, he told Chesla, he never intended to marry the fiancée who brought him to the U.S., or he simply wanted to come to the U.S (TR. p. 865). When asked if he recalled what he said, his answer was "I don't remember." (TR. p. 865). He did admit, however, on cross, that "What I

---

[8] The prosecution sought to simply convey that Najam did not marry his fiancée. Not that he committed fraud by lying to the Consulate in Jordan (see TR. 839-840). This was calculated to show that DeKelaita was the one to commit the fraud, and to render Najam more credible. As to the asylum claim, the prosecution's use of the word "story", repeatedly, gave the impression that DeKelaita had simply created tales out of the "whole cloth", that were not based on truth, and that were almost unknown to the witnesses until the interpreter explained it to them. But when asked for specific's Najam's answer was revealing, "He was asking me about the story, so I was answering him according to the story." (TR. p 848). When asked if he recalled getting a copy of his asylum application, along with "the story", he said "I don't remember." (TR. p. 857) When presented with proof that DeKelaita had mailed him the copy and asked about his uncle's address, he said "I don't remember." (TR. p 857) (see Najam's letter, Defense Exhibit I). When asked about the contents of the letter, he says "I don't know. I didn't see it." (TR. p. 858) And, "I don't remember seeing this." (TR. p 858) And "No, I haven't...I haven't seen it. I haven't seen it, and I don't remember." (TR.p. 858) Asked about when he saw DeKelaita, he said "I don't remember." (TR.p. 858) Asked about how he went to DeKelaita's office, he said "Yes...I remember I was alone..." but then "I don't remember who accompanied me and who drove me there." (TR. p. 859) Najam said he spoke to DeKelaita in Arabic. But when confronted with the fact that DeKelaita did not speak Arabic, Najam said "I don't know." (TR. p. 905), and "I don't recall." (TR. p. 905), and "I don't know. I forgot. I swear." (TR. p. 906).

Concerning his fiancée petition, he had testified that if things "work out", he would marry his petitioner. That was a lie that was very clear to the prosecution and it came out.

Nash: Q: If things work out. So you got a marriage visa, and you might...you might marry her, you might not is that about it?
    A.    True
    Q.    And you told the grand jury, I believe, that if it didn't work out, I would apply for asylum?
    A.    Yes, its true (TR. p. 860)

But, this was not true.

Nash: Q. In fact, Mr. Najam, that was a ruse. Wasn't it, a fraud?
    A.    Yes (TR. p. 861)

Again, concerning the fiancée fraud:

Nash: Q. It was all a fraud?
    A.    True.
    Q.    You were there to fool the embassy official?
    A.    Yes. (TR. p. 867)

Najam admitted to using pictures to fool the embassy into thinking that his engagement was real (TR. p. 877), and confirmed, again and again, that his fiancée visa was a fraud. "Yes", he said "that's correct." (TR. p. 874)

During his testimony, Najam answered "I don't know" or "I don't remember" or "I don't understand" over 66 times. (TR. p. 837-938)

remember is when they asked me, I told them I only wanted to come to the United States." (TR. p. 866) This, of course, after saying on direct that he was "going to marry" the woman who brought him to the U.S. (TR. p. 839), a woman whose last name he could not recall. Najam remains in the United States. His immigration status is good, and his "immigration benefit" upheld, despite the fact the government made him "no promises" for his testimony, and where he would ordinarily be stripped of his legal residency for his fiancé fraud alone, even without admitting to asylum fraud. However, once he did admit to asylum fraud, the fact that his immigration status remains is an impossible consequence under immigration law. 8 USC Sec. 1158 (d)(6).

Albqal, Najam's brother, could not really testify as to what was false in his case because it was based on the likelihood of future persecution but kept referring to "the story", a phrase that was used by the Prosecution to hint at the alleged fiction of the various statements of the witnesses in an attempt to influence the jury, just like in the case of Najam and other witnesses.

But were "the asylum stories" of Najam and Albqal fictional? Now, years later, both Najam and Albqal, are in the United States and their immigration status, as that of others, has remained. This, despite the fact that they both admitted to being involved in two frauds: fiancé visa fraud and asylum fraud. The jury was not made aware as to the immigration benefit given to the witnesses despite what the law required.

Knowledge on the part of the jury as to the benefit bestowed on the witnesses was obscured by the Prosecution's assertions that it may "do nothing", or even to report the cooperation of the witnesses to the immigration authorities, knowing that once the

witnesses files a frivolous asylum application, he or she cannot obtain "any benefit" under the INA. This lack of knowledge on the part of the jury deprived DeKelaita of a fundamental right to a fair trial.

## GROUND 2

*Confidential Informant (CI) Fadhil Rasho failed to testify in court and was not subjected to cross-examination, yet his selective statements were introduced before the jury, contrary to DeKelaita's fundamental constitutional right to a fair trial. Rasho lied to DeKelaita about his asylum claim at the direction of the Office of the Inspector General (O.I.G) of the Department of Homeland Security (D.H.S.) by telling DeKelaita that the statement prepared for him was correct, and was allowed to file - according to the Prosecution - a frivolous asylum application and subsequently withdraw it. Finally he was awarded asylum status, all in violation of the very laws the Prosecution alleged DeKelaita violated. Rasho's calculated absence deprived DeKelaita of critical information for a fair trial.*

Fadhil Rasho's case is one that the jury should have viewed in full light of the Prosecution's concern for truth telling in getting to the object of the "overarching conspiracy." Rasho, however, was not made available by the Prosecution.

Rasho was, and may still be, a confidential informant. He was sent to DeKelaita as an imposter client in 2008, lying about his reasons for seeking asylum (TR. p. 1819). His efforts yielded 75 C.D. recordings, all in a failed attempt to get DeKelaita to do something wrong. However, one C.D., a recording of an interview Rasho had with the asylum officer, with Adam Benjamin as his interpreter and another attorney accompanying him, implicated Adam Benjamin of mistranslating one word or sentence in the interview. That sentence, it should be noted, was not connected to Rasho's statement but to one question that the asylum officer posed to him in the interview, in which DeKelaita was not present. The Prosecution showed no other wrong-doing, and certainly did not show DeKelaita filed a false asylum application or told Rasho to lie. Rasho, rather, lied to DeKelaita.

The Prosecution never presented Rasho for cross-examination. There was good reason for this. Rasho's presence in court would have disclosed that Rasho's application

did not contain false statements as it was told to DeKelaita's office. In fact, more than one Asylum statement was completed and notarized by Rasho, reflecting what he said to DeKelaita or to his office. The notarized statements signed by Rasho were monitored by Mr. Chesla, who was directing Rasho, and who having listened to the recording, must have known what was said, and what was in the statements. The application that was filed, containing material lies by Rasho to DeKelaita, was clearly frivolous. But it was frivolous *at the direction of the government* and without DeKelaita's knowledge. After his application for asylum was denied, Rasho was placed in deportation proceedings, which were subsequently terminated, as in the case of Rafal Khizme. The jury did not know this. Rasho was then directed to simply cancel his first asylum application, file another, and have that one granted completely contrary to the law.  The law was broken, and a crime committed, but it was done under the direction of the Prosecution, all in an effort to show than an application based on "lies" was denied, but one that was "truthful" was subsequently granted. That's not what happened, and the jury did not know this. When one reviews the record what it reveals is that DeKelaita filed the application based on what he was told by Rasho and thus the application was accurate. The real lie, here, came from Rasho. For this reason, only a select "reading" of the translation of Adam Benjamin was read to the jury.

In its closing argument, the Prosecution's assertions regarding Rasho were ambiguous, never saying DeKelaita filed a false application for Rasho in 2008, but referring to "some recordings from Fadhil Rasho's asylum interview." (TR. p 1819). The prosecution stated that Adam Benjamin was "serving as the translator," (TR. p. 1819) but failed to mention that DeKelaita was not present at the same interview. This was

significant because there was no proof as to any wrongdoing on the part of DeKelaita with regard to Rasho's interview, and no one testified to any wrongdoing with regard to Rasho's application. Recall that this is a carefully monitored client. And out of the many recordings of this imposter client, the Prosecution chose two quick clips in its closing, making sure that it shows nothing more than a selection by "readers." This obscured a critical fact: DeKelaita was the one deceived by Rasho, and Rasho was the one directed by the Prosecution's agents to deceive the asylum office and the immigration court, committing perjury, filing a "frivolous" asylum application with DeKelaita's office, and ultimately obtaining illegal immigration benefits, all out of the view of the jury.

The Prosecution asserted that "this was an integral and very important part of the conspiracy, and you've seen it play out through these particular recordings." (TR. p 1820) If this was an "important part of the conspiracy," it should have been made clearer to the jury. The 7th Circuit has held "clarity is as important as accuracy given the limitations of juror's comprehension" <u>Balthazar v. City of Chicago,</u> 735 F.3d 634, 638 (7th Cir. 2013) (Quoted in Nathson Fields v. City of Chicago, et al, p. 12). The selective prosecution of Rasho's case certainly lacked clarity and accuracy.

Why did the government send Rasho to DeKelaita to lie, to commit perjury before the U.S. Asylum Office and the Immigration Court, in violation of 18 USC sec 1001, the "false statement" statute, which provides "whoever knowingly and willfully" makes a false statement... "shall be fined under this title, imprisoned not more than 5 years or...both" ? And why he was allowed to withdraw his application, contrary to law, and finally obtain Asylum status, after admitting his deception? All of this happened about

six years prior to the indictment and the jury knew none of it because Rasho was never cross examined.

None of this information, which would have shed light on the motive of the witnesses to lie and the Prosecution's attempts to bolster this case when this matter could have been resolved earlier, was ever made known to the jury.

Rasho's application was granted when the law clearly states that the applicant who files a false or frivolous asylum application is "permanently barred" from obtaining "any benefit" under the Immigration & Nationality Act (INA). 8 U.S.C 1158 (d)(6); 8 C.F.R. 1208.20. There are no exceptions for agents of the government or their informants in the INA.

The jury should have heard the cross-examination of Rasho and should have known the full extent of the reward given to the witnesses in exchange for their testimony – a reward that was contrary to law. The deprivation of the jury from having the full story of Rasho, a case that was carefully and secretly monitored by the Prosecution, deprived DeKelaita of due process in both confronting an accuser and having the full truth disclosed. This Court should find that the absence of this important and critical witness as fundamental error and cause for vacating the conviction.

Rasho, like Khizme, and all the other witnesses before this Court, was rewarded with immigration benefits that the jury did not know of. In the case of Rasho, it was all the more egregious because Rasho's reward was fully monitored by the Prosecution and fully hidden from the jury.

In the alternative, should this Court find that objections not made by Counsel on behalf of DeKelaita waived, it should find that such waiver was due to error, and that such error is material and fundamental to a fair trial.

## GROUND 3

***The Prosecution's case against "Attorneys A & B", according to its indictment and presentation before the jury, labeling the two as co-conspirators, is undermined by their non-prosecution by the administrative bodies-both the Attorney Registration and Disciplinary Commission (ARDC), and the Executive Office for Immigration Review (EOIR)-and demonstrates the non-existence of the alleged overarching conspiracy.***

The Prosecution's argument in this case was that DeKelaita directed "Attorneys A and B", Alen Takhsh and Alan Jacob respectively, in the over-arching conspiracy, DeKelaita being the alleged "hub" and the Attorneys "A and B" being "spokes." Attorneys A and B, then, according to the Prosecution's argument, were co-conspirators. A conspiracy is an "agreement by two or more persons to commit an unlawful act, coupled with an intent to achieve the agreement's objective…"(Black's Law Dictionary, 8th Edition, Thompson West, 204, Bryan Garner, Editor in Chief). Given this definition, as well as the fact that both Attorneys were given prosecutorial immunity, it must have been clear that both attorneys had the necessary Mens Rea to be labeled as co-conspirators in the indictment. But were the Attorneys in fact co-conspirators?

If Attorneys A and B were not co-conspirators, the Prosecution's case would change. It would have to take them out of the equation, thereby transforming the very nature of its theory. And the government's theory, as time has demonstrated, is now shown to be tenuous at best. Time has shown that neither Attorney A or B was a co-conspirator.

The Prosecution, in support of its cause, offered the testimony of Alen Takhsh, who focused on the role of Adam Benjamin, and alleged that DeKelaita knew about a marriage fraud case, where Takhsh was involved in. Takhsh signed documents attesting to telling the truth about his clients, represented the husband in person, even though he

allegedly was told by a friend of the applicant "you know this is bullshit." (TR. p. 366) He thus seemed to admit that he committed a crime. Takhsh also testified that he told DeKelaita that Adam Benjamin was at times mistranslating, but could not point to any specific example, nor name any specific client. As to the marriage case, the jury found DeKelaita not guilty. As to his complaints about Adam Benjamin, Takhsh admitted that even though he had expressed concern about DeKelaita using Benjamin as an interpreter, he himself, once he left employment with DeKelaita, and was working on his own and used Benjamin as a translator. (TR. p. 382-383) His concern about Benjamin's involvement, therefore, was not credible.

What did Alen Takhsh, or the Prosecution, think he did wrong or unlawfully in reference to an "overarching" conspiracy? His memory was uncertain. However, he did not admit to being part of any conspiracy, and named no client or witness whose case he was involved in, with reference to the Prosecution's "overarching conspiracy" case. The marriage fraud allegation, where DeKelaita was found innocent, had nothing to do with an "overarching conspiracy" to obtain asylum for Iraqi Christians.

The fact that neither Alen Takhsh nor Alan Jacob were ever disciplined or reprimanded by the ARDC (or even by the DOJ'S own EOIR), after an investigation, now shows the elements concerning a "conspiracy" as to "Attorney A and B" were non-existent. How else could the Prosecution explain the complete lack of any disciplinary action? It is one thing to obtain prosecutorial immunity from the Department of Justice as to a criminal case, but to the avoidance of any action on the part of the ARDC is telling. Further, and even more problematic for the prosecution, is the lack of any action by the DOJ's own EOIR, Attorney Disciplinary Project to even reprimand these Attorneys.

22

## IV.    **CONCLUSION**

For the reasons stated above, the Honorable Court should grant all necessary relief and vacate the conviction of DeKelaita as to the remaining Count I, and grant any further relief it deems just and appropriate.

Respectfully Submitted,

Robert DeKelaita

Robert DeKelaita

#47542424

FCI- Terre Haute

P.O. Box 33

Terre Haute, IN 47808