**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff-Respondent,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18 C 6682** |
| | ) | |
| **ROBERT DEKELAITA,** | ) | |
| | ) | |
| **Defendant-Movant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

In May 2016, a jury convicted Robert Dekelaita on a charge of conspiracy to commit asylum fraud and on three charges involving false statements in connection with a particular asylum application. After trial, the Court entered a judgment of acquittal on the three substantive charges but upheld Dekelaita's conviction on the conspiracy charge. The Court imposed a fifteen-month prison sentence. In November 2017, the court of appeals affirmed Dekelaita's conviction and sentence (the government did not appeal the post-trial judgment of acquittal on the other charges). *See United States v. Dekelaita*, 875 F.3d 855 (7th Cir. 2017).

Dekelaita was an attorney who specialized in immigration law. The evidence offered against him at trial included testimony by a number of his former clients that he had counseled or assisted them in submitting fraudulent applications seeking asylum in the United States. The fraud largely involved exaggeration or fabrication of claims they had been persecuted in their countries of origin; some of it involved concealing that the

applicant had already obtained refuge in another country, which would have disqualified the applicant from obtaining asylum in the U.S. Each of the client-witnesses admitted knowingly seeking and/or obtaining asylum by fraud.

As a result of the client-witnesses' admissions to investigators and in their testimony, they were all subject to deportation—"removal," in immigration lingo. During Dekelaita's trial, each of them testified that they had been offered no promises or assurances regarding their future immigration status or their ability to remain in the U.S. In closing argument, the government cited the client-witnesses' admissions—and, implicitly, the absence of any promises about their future—as buttressing their credibility:

> There has been lots of talk about incentives in this case. Do you know what the easiest way if you're a citizen of the United States based on asylum to keep your asylum status? How about not admit that you committed fraud? That would be a good guess. Do you know what the easiest way to lose it is? Admit that you committed a crime. Right?

*United States v. Dekelaita*, No. 14 C 497, trial tr. 1873-74.

In October 2019, Dekelaita filed a motion under 28 U.S.C. § 2255 asking the Court to vacate his conviction and sentence. He cited several grounds. Only one survived the government's request for dismissal. Dekelaita contends that the client-witnesses were given express or tacit assurances that they would not be deported or, to put it another way, that they would be able to remain in the U.S. As evidence Dekelaita cited, among other things, the fact that no steps had been taken since the trial to deport any of the client-witnesses despite their sworn public admissions of immigration fraud. Dekelaita argued that any such assurances had not been disclosed to him prior to or during the trial, in violation of the government's disclosure obligations under *Brady v.*

*Maryland*, 373 U.S. 83 (1963), and its progeny, and that the witnesses' trial testimony about this was false. The Court ordered a hearing on this claim.

An evidentiary hearing was held in December 2020. It included testimony by approximately twenty witnesses as well as the submission of deposition testimony. The hearing took seven days, not including the time needed to review the deposition transcripts. The witnesses at the hearing included a number of the client-witnesses and others related to them, the government's case agents, and several officers and officials with the Department of Homeland Security, U.S. Citizenship and Immigration Services, and Immigration and Customs Enforcement.

The government's case agents—the agents who conducted and supervised the investigation and dealt with most of the government witnesses—were Tony Chesla and Tyler Shoudy. Both were special agents of DHS's Office of Inspector General, which the Court will refer to as OIG. Chesla was still an OIG special agent as of the date of the evidentiary hearing; Shoudy had recently retired. Both testified at the hearing, Chesla at great length.

After the evidentiary hearing, the parties filed post-hearing briefs. Briefing was completed around the end of March 2021. This decision constitutes the Court's findings of fact and conclusions of law. The Court apologizes for its delay in issuing its decision.

### Facts

Dekelaita contends that express or tacit assurances of future benefits were made to the client-witnesses before his trial but were not disclosed as required under *Brady*. He also contends that the government presented false testimony from the witnesses on this point. At various junctures during the hearing and since, Dekelaita has also

referenced other information (regarding various matters that he potentially could have used to cross-examine certain of the client-witnesses) that he contends was not disclosed to him. The latter contentions were not part of Dekelaita's section 2255 motion, and thus a claim based on these contentions is not properly before the Court. That aside, none of that particular allegedly undisclosed information was material, even when viewed collectively.

The evidence concerning the client-witnesses falls into four baskets. First, none of them have been deported, nor have immigration authorities taken any steps in that direction regarding any of them. Second, there is evidence tending to show that OIG agent Chesla did certain things that helped forestall or delay adverse action against the client-witnesses. Third, after the trial, the OIG case agents offered assistance to the client-witnesses on immigration-related matters when the witnesses reached out to them, and in a couple instances without being asked to do so. Finally, there is evidence concerning an apparent post-trial immigration fraud by one of the client-witnesses that was known to the OIG agents—at least agent Chesla—but that he did not report and, arguably, facilitated.

The Court has considered all of the evidence and has made determinations regarding the credibility of the witnesses. It finds as follows.

**1.    Non-deportation of client-witnesses**

As of March 2021, nearly five years after Dekelaita's trial, all of the client-witnesses—Rafida Jabo-Cordova, Rawa Jibrail, Raman Esho, Saad Salman, Salman Salman, Hilal Albqal, Nahail Najam, Saba Mosa, Mosa's wife Ikhlas Zaiya, and Louay Kouza—were still in the United States with legal status despite their admitted

immigration fraud.[1]

The first and most obvious question is, why?  For two of the witnesses (Esho and Salman Salman), both of whom were naturalized citizens, immigration authorities made an affirmative decision post-trial not to seek denaturalization.  The Court will address Esho and Salman momentarily.

With regard to the other client-witnesses, the evidence, from a big-picture standpoint, does not support a finding that any affirmative decision was made not to institute removal proceedings against the client-witnesses.  Rather, the reason for the government's inaction appears to be much more mundane:  a combination of inertia and bureaucratic decisions.  That said, in some instances, as the Court will discuss, agent Chesla did things that had the effect of forestalling the institution of removal proceedings against certain client-witnesses.  There is insufficient evidence, however, to support a finding that this was done as part of a design or plan on his part that existed before Dekelaita's trial, let alone that any of the client-witnesses understood at the time of the trial that Chesla would do anything along these lines.

To review the evidence in a bit more detail:  The government has a hands-down deportation case against each and every one of the client-witnesses based on their sworn admissions of fraud.  For this reason, one might think that they would have been put into removal proceedings immediately after Dekelaita's trial or, perhaps, after his appeal.  But they were not, nor were their cases even prioritized.  Rather the agency decided to conduct a general review of every case that Dekelaita had handled over the

---

[1] It's likely the Court would have been told if one or more of the client-witnesses was deported after the evidentiary hearing.  But even if that has happened without the Court's knowledge, it would have no bearing on the decision.

years,[2] and, somewhat astonishingly, it did not put the client-witnesses at the head of the line or even close to it. None of their files had been reviewed in this process as of the completion of briefing in the present case, more than four and one-half years after Dekelaita's trial. Thus all of the client-witnesses retained their previous legal status despite having admitted under oath that they obtained that status by fraud. There is no evidence to indicate, however, that this was the result of some design or understanding that existed at the time of Dekelaita's trial. Rather, the key decisions and actions took place after the trial. And there is no evidence that the investigating OIG agents or anyone connected with the prosecution team had anything to do with it, except in one specific way that the Court will discuss in a moment.

In short, there is no evidence that the deportation review process—specifically, the delayed review or non-review of the client-witnesses' cases—was set up in order to benefit them in return for their cooperation. Indeed, there is only one aspect of the review process that might be considered as an actual affirmative effort to assist the client-witnesses. The evidence showed that the review of Dekelaita's clients' files is being conducted by the Fraud Detection and National Security Directorate, part of USCIS. The evidence, including testimony by Kenneth Madsen, the head of the USCIS Chicago asylum office, reflects that an individual's case cannot be, or at least is not, reviewed for fraud unless the file—called an "A file"—is physically in the hands of the reviewer. Why this is so is a mystery apparently known only within the DHS bureaucracy. It is plain from the evidence, however, that at least part of the reason that

---

[2] This was, it appears, a total of around 1,100 cases. As of the time of the evidentiary hearing, around 700 had been reviewed, with another 400 not yet reviewed—including, it appears, *all* of the client-witnesses' cases.

6

the client-witnesses have thus far managed to avoid having their files reviewed, let alone being placed in deportation proceedings, is that *agent Chesla has kept their A files*.  The evidence showed that without having the files, FDNS will not review the client-witnesses' cases and thus cannot recommend them for placement in removal proceedings.  In addition, the evidence showed that agent Chesla was, at the relevant times, aware of the impact of his retention of the A files.  Specifically, the evidence clearly showed, and Chesla conceded during his testimony (albeit somewhat grudgingly, and even then not completely) that no action vis-à-vis a particular individual was likely to take place if FDNS did not have the individual's A file.

Why has agent Chesla held onto the client-witnesses' A files rather than allowing FDNS to review them?  During his testimony, Chesla described an established investigatory process for OIG to document a witness's immigration fraud, saying that the resulting memo would be placed into the witness's A file.  Agent Chesla justified keeping the client-witnesses' A files based on a claimed need for direct physical access to them in connection with the proceedings on the section 2255 motion.  This is nonsense, at least based on the evidence presented at the hearing:  there's no plausible reason—at least none supported by evidence—that the hypothetical need to access the files or to write memos for the files required agent Chesla to physically maintain them in his own office.  And that aside, no justification supported by credible evidence was offered for why the OIG agents never finished—and maybe never even started—the process of documenting the client-witnesses' *admitted frauds*.  The bottom line is that any suggestion (which the government hints at) that it's effectively the pendency of Dekelaita's section 2255 motion that has held things up vis-à-vis the client-witnesses

7

doesn't hold water; it's completely unsupported by credible evidence.[3]  Rather, the evidence supports a finding that at some point after Dekelaita's trial, agent Chesla retained the A files knowing, and quite possibly intending, that this would forestall the initiation of removal proceedings against the client-witnesses.

This, to be clear, is undeniably a benefit for each of the client-witnesses who testified against Dekelaita.  But the evidence does not support the proposition this was part of a design that Chesla, or for that matter any other government representative, had prior to Dekelaita's trial.  Nor does any evidence suggest that before the trial the client-witnesses were expressly or tacitly made aware, or that they understood, that any steps (like this or otherwise) would be taken that would slow-walk the removal process or enable them to stay in the U.S. indefinitely.

As indicated earlier, two of the client-witnesses—Raman Esho and Salman Salman—are naturalized U.S. citizens.  At some point after Dekelaita's trial, immigration authorities made a decision not to institute denaturalization proceedings against them despite their admitted fraud.  There is no evidence, however, that the OIG agents or anyone else involved with the prosecution of Dekelaita played any role at all in this decision.  The decision was made in a part of the agency outside their purview, and from the evidence before the Court, it was made well after Dekelaita's trial.

The evidence does not support a finding that either Esho or Salman had an understanding before trial that the government would take no steps against them or that, as a result, they would get to remain in the U.S.  It is quite likely, and the evidence

---

[3] On a separate but related point, the government has never contended that it is keeping the client-witnesses in the U.S. just in case the section 2255 motion results in an order for a new trial.

reflects, that the decision not to seek denaturalization was significantly influenced by the fact that Esho and Salman had been cooperating witnesses in Dekelaita's case. But as the Court will discuss, when the government provides a witness with favors or benefits after trial, this does not run afoul of a defendant's constitutional rights, absent an agreement or tacit understanding that existed at the time of trial. The evidence does not support that such an understanding existed here.

2.     **Client-witnesses to whom OIG agents provided assistance post-trial**

The evidence showed that after the trial, a number of the client-witnesses were given advice, aid, and/or assistance by the OIG agents—mainly agent Chesla—and, through them, by others at DHS/USCIS. The evidence also showed, contrary to agent Chesla's protestation at certain points during his testimony, that he would not have rendered this assistance if these had not been cooperating witnesses—in other words, he acted because of their cooperation. The Court will start with the simpler matters and move to the more complicated.

a.     **Hilal Albqal, Nahail Najam**

Hilal Albqal and Nahail Najam are brothers who, like the other client-witnesses, admitted obtaining their immigration status by fraud. At some point after the trial, Chesla made it clear to their attorney that they could not apply for naturalization. Chesla advised, however, that he had no issue with renewal of their green cards (evidence of their legal status), even though they had obtained that status by fraud.

b.     **Louay Kouza**

In 2017, after Dekelaita's trial, agents Chesla and Shoudy went to Louay Kouza's home to discuss the possibility that he could obtain legal (and untainted) status through

his wife, who is a U.S. citizen.  Chesla inquired of higher-ups at USCIS to see if this was doable and was told it was not; he let Kouza know this.

Kouza, like the other client-witnesses, has not been deported despite his admission of immigration fraud.  When Kouza learned about Dekelaita's request to reopen his case, he reached out to Chesla to ask if this would cause him (Kouza) any problems.

Kouza also testified, credibly, that Chesla advised him—likely at an earlier point—that there was no problem applying for renewal of his green card when it was about to expire.  In fairness, the evidence showed that renewal of a green card is (at least at the times relevant in this case) a routine procedure that does not involve reexamination of the original basis for issuance of a green card—which, for each of the client-witnesses, involved fraud.  That said, agent Chesla certainly was aware of these witnesses' fraud.  He did nothing or next to nothing post-trial to report this to the particular authorities responsible for initiating removal proceedings.

### c.    Rawa Jibrail

After Dekelaita's trial, Rawa Jibrail, another client-witness, reached out to agent Chesla for assistance on an issue relating to her U.S. green card and her Swedish passport.  The name on the green card—her married name, Rawa Jibrail—did not match the name on her Swedish passport (Raua Mansoor), which was up for renewal. It appears that to get the Swedish passport renewed, Jibrail needed evidence to show that she, the person identified in the U.S. green card, was the same as the person identified in the Swedish passport.  She reached out to agent Chesla for assistance, either directly or perhaps through her counsel.  Chesla obtained from the special agent

in charge of the Chicago OIG office a letter for Jibrail to submit to the Swedish embassy.  This by itself amounted to significant assistance by Chesla, but the text of the letter is also interesting.  Specifically, the letter referenced Jibrail's pending naturalization application in a way that arguably suggested it might be granted[4]—which both Chesla and Jibrail (not to mention the special agent in charge) knew was untrue given the application's fraudulent nature.  The letter also indicated, again without referencing Jibrail's fraud, that she would maintain her permanent resident status in the U.S. indefinitely (even "upon expiration of her permanent card," *see* Def.'s Ex. 23).

The latter statement arguably could be viewed as evidence of an understanding with Jibrail that she *would* be allowed to remain in the U.S.—the very point that Dekelaita claims in his section 2255 motion.  But that's not something that OIG could actually deliver on, and the Court is not persuaded that the agents were saying this in the letter.  The better reading is that the statement in the letter amounted to a prediction that Jibrail's green card (like those of the other client-witnesses) would be renewed—a routine step, as the Court has indicated.

This episode, consistent with other evidence discussed below, is best understood as showing the OIG agents' willingness to provide assistance to the client-witnesses post-trial and the witnesses' understanding that they could reach out for such assistance.  An additional related point is that Jibrail quite obviously had a significant comfort level in reaching out to agent Chesla for assistance despite her admitted fraud. The Court will return to these points after it assesses the remaining evidence.

---

[4] The letter (Def.'s Ex. 23) said, "Ms. Mansoor has a current Application for Naturalization pending with US Citizenship and Immigration Services which has not been adjudicated to date."

11

This was not all that Jibrail asked of agent Chesla after Dekelaita's trial, and not all that he did. The evidence showed that Chesla made inquiries within USCIS, specifically to an immigration officer with FDNS, to determine if an expired I-130 petition for alien relative (used to seek a green card) earlier submitted by Jibrail's father on her behalf could be revived. If so, this would have enabled Jibrail to obtain green card status untainted by her asylum fraud—which, in turn, could have allowed her to remain in the U.S. legally. And when the other official (Douglas Lintz) said, after inquiry, that this was not doable, Chesla persisted to some extent, inquiring of Lintz, "what if we ask nicely?"

This effort by Chesla on Jibrail's behalf was unsuccessful, but that does not make this episode any less relevant. Making inquiries like this—and obtaining letters like the one Chesla got for Jibrail to submit to the Swedish embassy—was not part of Chesla's day-to-day responsibilities as an OIG agent; he does not deal routinely with "ordinary" applicants for immigration benefits. Rather, it has overwhelmingly been shown that Chesla undertook to assist Jibrail on both of these matters specifically because of her cooperation against Dekelaita. The Court finds—despite Chesla's contrary claim at points during his testimony—that agent Chesla would not have rendered assistance to the client-witnesses, including Jibrail, were it not for their status as cooperating witnesses against Dekelaita.

Agent Chesla took one further affirmative step that assisted Jibrail—though the government, in its brief, seems to contend it was not really assistance. *See* Gov't's Post-Hearing Mem. at 11. Jibrail had a pending application for naturalization. At some point after Dekelaita's trial, the USCIS Chicago field office asked Chesla for Jibrail's A

file so that it could adjudicate her naturalization application. The evidence showed that if the application had gone to adjudication, there was a significant risk that Jibrail's previously admitted asylum fraud would have become known to USCIS, and it's overwhelmingly likely that she would have been placed into deportation proceedings if this had happened. But Chesla not only advised Jibrail to withdraw the naturalization application; he affirmatively assisted her in doing so in 2018—actually submitting the withdrawal request himself, on Jibrail's behalf. Chesla also communicated with key officials—the head of the USCIS Detroit field office and a supervisory official named Douglas Pierce—to get the withdrawal filed and processed. This prevented an adverse adjudication of Jibrail's application for naturalization and likely, for that reason, helped forestall her removal from the U.S.

### d. Sabah Mosa & Ikhlas Zaiya

Sabah Mosa, who like the other client-witnesses admitted immigration fraud under oath at trial, also was the beneficiary of post-trial assistance from agent Chesla. First, in September 2016, after Dekelaita's trial, USCIS in Chicago asked Chesla for Mosa's A file so that it could provide the file to ICE enforcement personnel for possible deportation of Mosa. Chesla did not provide the file but instead sent a scanned version on a CD. As the Court has relatedly found, it's more likely than not the absence of the physical A file forestalled further action by ICE against Mosa.

The arguably more significant post-trial matter involving Mosa took place in 2017. Mosa was taken into ICE custody in Michigan as part of a mass immigration-related arrest. A member of Mosa's family contacted Chesla, working through (it appears) one of the interpreters who assisted during Dekelaita's trial. The family "implor[ed]" Chesla

to "please intercede."  Chesla did so, making contact with ICE personnel to advise them that Mosa had been granted withholding of removal and thus should not be deported. Mosa was released from custody two days later, and the evidence shows that at least the timing of his release was a direct result of Chesla's intervention.  An ICE officer testified at the hearing in this case that Mosa was released because it was brought to ICE's attention that he had been granted withholding of removal.

The Court acknowledges that Mosa was *entitled* to be released for this reason; an immigration judge had already granted withholding of removal, meaning that Mosa was entitled to remain in the U.S.  There are two points here, however, that are significant with respect to Dekelaita's claim.  First, the ICE officer testified, credibly, that he was never made aware that Mosa had obtained withholding of removal by fraud—and the Court finds that this, in turn, is because Chesla did not let this on to the ICE official(s) he contacted.  The ICE officer also testified, credibly, that if he had been made aware of Mosa's fraudulent obtaining of withholding of removal, he would have notified ICE's litigation section, and a "notice to appear"—the official document that initiates deportation—would have been issued to Mosa.  It's highly likely that agent Chesla was aware of this when he interceded with ICE on Mosa's behalf and said nothing about Mosa's fraudulently obtained status.  Second, a key point here is that Mosa's family *knew to* reach out to agent Chesla when Mosa got into trouble, and it *knew how to* reach him.  Having an insider at DHS to advocate for Mosa was a benefit that he garnered from testifying against Dekelaita.

Agent Chesla's intercession on Mosa's behalf was a direct product of Mosa's cooperation against Dekelaita.  Chesla claimed that he acted out of a motive unrelated

14

to Mosa's status as a cooperating witness—"[P]art of the . . . OIG's, you know, mission is to try to make the department run more efficiently and effectively.  And that was a mistake on [ICE's] part that they arrested Mr. Mosa," Hearing Tr. 795—and that he would have done the same if he had learned similar facts about someone who was not a cooperating witness.  That testimony wasn't in the least bit convincing, and in any event it misses the point:  the only way Chesla learned about Mosa is that Mosa and his family knew to reach out to Chesla and knew how to do that.[5]

In summary, the evidence presented at the hearing—including the evidence discussed in the next section of this opinion—quite clearly showed that the client-witnesses knew they could reach out to the OIG agents after the trial for immigration-related assistance.  The evidence also showed, and it is significant, that they were comfortable reaching out to the agents who had investigated them and Dekelaita even though they had admitted immigration fraud.  The evidence further showed that the client-witnesses knew *how* to reach the OIG agents, which reflects that the agents (at least agent Chesla) had given them contact information and had let it be known that the witnesses could reach out if they needed help.  There is no basis in the evidence for a finding that any results—continued legal status or the ability to remain in the U.S.—were guaranteed.  But the Court has no question that the client-witnesses had an

---

[5]    Chesla also made other inquiries on behalf of Mosa and his wife Ikhlas Zaiya.  In 2018, Chesla inquired of Frank Ledda, deputy chief counsel in ICE's Office of Chief Counsel, regarding ways in which Mosa and Zaiya might be able to obtain untainted legal status.  It does not appear, however, that Mosa and Zaiya followed up.  They did later file a motion to reopen their immigration case to change their status from withholding of removal to asylum, based on country conditions in Iraq.  The Office of Chief Counsel (through Ledda) opposed this due to Mosa's prior false statements.  As of the date of the hearing, there had been no further activity, however.

understanding before, at, and after the time of Dekelaita's trial that an "insider" (agent Chesla or agent Shoudy) was available to render assistance. This, however, is the extent of the understanding that the Court finds existed before and at the time of Dekelaita's trial. The evidence does not support a finding that, as Dekelaita contends, the client-witnesses were expressly or tacitly promised continued legal status or the ability to remain in the U.S., indefinitely or otherwise.

**3.      Rafida Jabo-Cordova**[6]

Rafida Jabo-Cordova, like other client-witnesses, was born in Iraq. She later relocated and eventually married Francisco Cordova, a citizen of Ecuador. Jabo-Cordova then became a citizen of Ecuador and renounced her Iraqi citizenship. She and Cordova later relocated to Canada, hoping to get into the United States. Jabo-Cordova entered the United States from Canada shortly thereafter, in 2002. Here is her testimony during Dekelaita's trial regarding her entry into the U.S.:

> Q: How did you enter the United States, like physically, how did you enter?
>
> A: By car.
>
> Q: Okay. Who were you with?
>
> A: With some family member [sic].
>
> Q: *What passport did you use to come into the United States?*
>
> A: *My sister's passport.*

Case No. 14 CR 497, dkt. no. 312 at ECF pp. 37-38 of 217 (Trial Tr. pp. 537-38)

---

[6] Some of the facts stated in this section regarding Jabo-Cordova come from her testimony at Dekelaita's trial. Because some of the background was understandably glossed over during the evidentiary hearing, the Court used Jabo-Cordova's trial testimony to round out the facts concerning her cooperation and testimony against Dekelaita.

(emphasis added).  On cross-examination, Jabo-Cordova repeated her testimony regarding her use of her sister's passport:

> Q:  Did you come into the United States illegally?
>
> A:  That's correct.
>
> Q:  *And you used your sister's passport to do that; is that correct*?
>
> A:  *That's right.*

*Id.* at ECF pp. 158-59 of 217 (Trial Tr. pp. 658-59) (emphasis added).  This was consistent with what Jabo-Cordova had told the OIG agents prior to the trial about her entry into the U.S.

Later in 2002, Jabo-Cordova retained Dekelaita to represent her in attempting to obtain legal status in the U.S.  She testified at Dekelaita's trial that she told him her entire relevant history, including where she had lived and the fact that she held Ecuadorian citizenship, not Iraqi citizenship.  According to Jabo-Cordova, Dekelaita recommended filing an application for asylum and withholding of removal based on Iraqi nationality—even though she no longer had Iraqi citizenship, was a citizen of Ecuador, and had not lived in Iraq for years.  She testified that a false story was put together to support a request for asylum, fraudulent documentation was obtained and submitted, and numerous false statements were made in the asylum application.  Nonetheless her application for asylum was rejected, both by the asylum officer and then by an immigration judge.  An appeal (or perhaps what's called a motion to reopen) was filed.

Jabo-Cordova's immigration court matter was still pending in 2006 when she began to cooperate with OIG agents, including eventually against Dekelaita.  She testified at Dekelaita's trial that in return for her cooperation, she had gotten

17

authorization to work in the U.S. and reimbursement for certain expenses. At some point, Jabo-Cordova had hired a different attorney, Dalia Kejbou, to represent her in the ongoing immigration court proceedings. But at the direction of the OIG agents, she "re-retained" Dekelaita and then recorded incriminating conversations with him.

As of the time of Dekelaita's trial, Jabo-Cordova's work authorization was close to expiring. She indicated that her husband, who by then had become a U.S. citizen, had "applied for me," *id.* at ECF p. 160 of 217 (Trial Tr. p. 660), which based on testimony at the section 2255 hearing is an apparent reference to her husband's I-130 application for an immigrant visa for Jabo-Cordova. It appears from her testimony at the hearing that she obtained that visa in or about 2014, not too long after her husband attained U.S. citizenship.[7] This enabled her to continue working.

After Dekelaita's trial, Jabo-Cordova, through attorney Kejbou, pursued a concerted effort to clear up her immigration status and attempt to obtain untainted legal status in the U.S.

One of Jabo-Cordova's problems was that her initial entry into the United States was not legal. Another significant problem, of course, was that she had filed a fraudulent asylum application (as she admitted before and at Dekelaita's trial)—though no immigration judge had yet found this. But Jabo-Cordova's immigration proceedings—which based on the evidence appear to have been further proceedings following the denial of her asylum application—were still open. Thus she was at risk

---

[7] The I-130 application said Jabo-Cordova had entered the U.S. as a "visitor," which was false. When asked about this at the hearing, Jabo-Cordova gave evasive responses and then stated that she had thought the question concerned her husband, not her. This testimony was not credible.

that an immigration judge would become aware of her fraud and would make a finding in that regard. This, in turn, likely would have torpedoed Jabo-Cordova's attempt to obtain legal status.

The effort to clear up Jabo-Cordova's status involved several interrelated steps: closing out the pending immigration court case without an adverse finding, and filing an I-601 (or I-601A) application for waiver of inadmissibility and an I-485 application for adjustment of status. The evidence showed that after Dekelaita's conviction was affirmed on appeal, Chesla rendered assistance to Jabo-Cordova in successfully navigating each of these steps.

The first step was to close out Jabo-Cordova's pending immigration court case. The pendency of the case was a barrier to obtaining permanent legal status, and as indicated it put Jabo-Cordova at risk that an immigration judge would eventually consider her case and learn (and then find) that she had committed immigration fraud. That could have been devastating: the evidence showed that a person who has been found by an immigration judge to have filed a frivolous asylum application is permanently barred from future immigration benefits.

Once Dekelaita's conviction was affirmed on appeal (which agent Chesla seems to have considered the trigger enabling him to take action), Chesla—to assist Jabo-Cordova and her counsel—took steps to secure DHS's agreement to terminate her pending immigration court proceedings, so that no adverse finding would be made. Chesla's efforts included communicating with DHS's office of chief counsel and preparing a memorandum—noting Jabo-Cordova's cooperation in Dekelaita's case—to secure that office's non-opposition to termination of the proceedings. These are not the

sort of acts that Chesla commonly undertakes as part of his regular duties; the evidence showed that he provided this assistance due to Jabo-Cordova's status as a cooperating witness.  The effort, which succeeded, was beneficial to Jabo-Cordova.

Next came the I-601 and I-485 applications.  The two, as best as the Court could make out from the evidence, were basically a package deal.  Though the evidence on this point was not crystal clear, an I-601 application is filed by an immigrant who wants to obtain legal status in the U.S. but is not eligible to do so.  The application is a request to "waive" certain bases for inadmissibility into the U.S.  If granted, the applicant can then seek legal status.  In preparing these applications, Jabo-Cordova was working with attorney Kejbou.  Both of them engaged in significant communications with the OIG agents, in particular agent Chesla, regarding the contents of the applications.  Attorney Kejbou sent multiple drafts of one or both of these applications to agent Chesla for his review and comment.  To state what is perhaps obvious at this point, the evidence showed that prefiling review of applications for immigration benefits was not part of Chesla's ordinary responsibilities.  He did so in this case to assist Jabo-Cordova due to her cooperation.

In a vacuum, there was no apparent benefit in having Chesla review these documents.  But those involved were not operating in a vacuum; these events took place within a historical context.  The Court discusses that next.

Some bases for inadmissibility cannot be waived via an I-601 application—at least that's what the evidence presented at the hearing showed.  Specifically, the evidence showed that if the applicant previously made a false claim of U.S. citizenship,

that can't be waived via an I-601 application.[8]

As discussed earlier, Jabo-Cordova had told the OIG agents before Dekelaita's trial, without hedging, that she had "used her sister's passport" to gain entry into the U.S. when she came in from Canada. She also testified to exactly that, twice, at the trial. There's no doubt about this. There's also no serious room for doubt on what her statements meant: "used" means exactly what it says—in other words, Jabo-Cordova said she had gotten into the U.S. by using her sister's passport.

This fact, though Jabo-Cordova had verified it to the agents and under oath in court, was not good for her. The evidence at the hearing established that use of another person's passport to enter the U.S. constitutes making a false claim of U.S. citizenship. If found out, that would be a non-waivable ground of inadmissibility that would preclude Jabo-Cordova from obtaining further immigration benefits (including legal status) and likely would lead to her removal. There's no question that attorney Kejbou knew this and no question that the OIG agents, including agent Chesla, knew it.

If what Jabo-Cordova had told OIG agents and testified to under oath regarding her entry had been included in her I-601/I-485 applications, the applications would have been denied, and this could have led to proceedings for her removal from the U.S. But the evidence shows that a decision was made by someone—at least initially, Jabo-Cordova and her attorney—to present a different story to the immigration authorities in the applications.

It's reasonable to infer, and the Court does infer, that Jabo-Cordova and/or her

---

[8] In addition, the evidence at the hearing appeared to show that if Jabo-Cordova had actually been found by an immigration judge to have committed immigration fraud, that, too, could not be waived via an I-601 application.

attorney considered it imprudent to change the story about her entry without first running it past the OIG agents to whom she had told the story in the first instance. So that's what they did; in practical effect they were seeking Chesla's tacit (or perhaps more than tacit) approval of the changed story.

In the drafts of the applications that attorney Kejbou sent to agent Chesla for his review, there was nothing about using her sister's passport. Rather, the story offered in the initial drafts was that Jabo-Cordova had been "smuggled" into the U.S. That's an illegal entry, of course, but the evidence showed it's a waivable ground of inadmissibility. It was also inconsistent with her testimony under oath at Dekelaita's trial.

The story ultimately presented in the application that Jabo-Cordova, through Kejbou, actually filed, however, was different still—and, on its face, much better for her. Specifically, she stated that she was in the back seat of a vehicle that was "waved through" (or, perhaps, "waived through") at the border checkpoint. When asked about this by an immigration officer at her interview on the application, Jabo-Cordova stated that no passport had been presented. As told in the application and interview, it was still at least arguably an unlawful entry, but it was a waivable basis for inadmissibility and one that would not give rise to a permanent bar.

This, based on the evidence, was a false story regarding Jabo-Cordova's entry into the United States.[9] Agent Shoudy testified at the evidentiary hearing that Jabo-Cordova told OIG (before Dekelaita's trial) that she *actually used* her sister's passport:

---

[9] The fact that Jabo-Cordova's story changed more than once after the trial is relatively strong evidence (though not the only evidence) that her final version, about having been "waved through," was untrue.

Q:  Why don't you first, before I show you anything, tell me what your personal memory of what she told you was.

A:  Okay. My personal memory was that she illegally -- well, she might have come without a visa into Canada.  And then her family members went over into Canada.  Her sister looked a lot like her, so I guess they used her sister's passport.  Came back to the bridge.  All the passports were given to the inspector who then waved them in.  So, in essence, she was in a car, you know, that was -- she was entitled to entry, which she probably wasn't supposed to be entitled entry.

Q:  So your sound cut out for just a second.  I want to make sure I got your answer.

From what you're aware of, she had her sister's passport.  She was in a car with other people.  They handed the passports over to an agent, and that's how she entered the United States?

A:  Well, my exact memory is that she never had the passport in her hands, but one of the family members had it, whoever was, I assume, because they had been talking to the inspector.  All the passports were handed over to the inspector, who inspected the passports and then admitted them and waved them through.

Q:  And the sister wasn't in the car with Ms. Jabo-Cordova, correct?

A:  No, she was not.

Hearing Tr. 882-83.  The Court finds Shoudy's detailed testimony credible and finds Chesla and Jabo-Cordova's contrary testimony about what she did and what she told OIG not to be credible.

Chesla reviewed at least two and possibly more than two drafts of the application, none of which were consistent on this point with what Jabo-Cordova had told him or what she had told the jury at Dekelaita's trial, and which gave increasingly non-inculpatory—and, as the Court has found, false—versions of Jabo-Cordova's entry. Chesla interposed no objection and raised no questions.  In context—given his role in the process of drafting the applications—this amounted to at least tacit approval by

Chesla of the changed and false story, and the Court so finds. But there's more. The evidence showed that at some point before the applications were actually filed, Chesla went out and re-interviewed Jabo-Cordova about the circumstances of her entry and "confirmed" the wave-through story that she was proposing to present to USCIS in her applications. In this way, agent Chesla appears to have not simply stood by as Jabo-Cordova committed a further immigration fraud; he appears to have facilitated it via the supposedly "confirming" interview.[10] This was another post-trial benefit to Jabo-Cordova from her cooperation against Dekelaita.

Once Jabo-Cordova's I-601 and I-485 applications were finalized and filed, Chesla took steps behind the scenes to make sure they would be adjudicated promptly—and also to make sure the adjudicator(s) knew that Jabo-Cordova had the support of OIG. The evidence showed that Chesla communicated about Jabo-Cordova's applications with Michael Klinger, the USCIS Detroit field office director, and with immigration officers Amanda Cindrich and Amanda Aghos, who adjudicated the I-601 and the I-485. Chesla essentially testified that he was simply checking on the status of these matters, but the evidence showed that what he was actually doing was communicating to the officers, at least tacitly, that the applications had OIG's support.

---

[10] A possible explanation, offered by Chesla, was that when Jabo-Cordova said she had "used" the passport, that did not mean "presented"; the initial interviews and testimony just weren't specific enough; and all that was done was to clear this up. It's not a believable explanation, and the Court in fact doesn't believe it. First of all, as the Court has found, Shoudy's rendition of Jabo-Cordova's explanation of the events to OIG was credible, and Chesla's was not. In addition, Chesla consistently attempted to minimize his post-trial assistance for the client-witnesses and did so in a way that impaired his credibility. His lack of credibility on those matters is one additional point that impairs his credibility here as well.

Both applications were approved.[11]

It is noteworthy that after her green card application was approved, Jabo-Cordova texted Chesla to thank him. When asked why during the hearing, Jabo-Cordova responded in a way that suggested that she really didn't have anything to thank Chesla for *with respect to the applications*. That testimony was utterly lacking in credibility. She had, and knew she had, plenty to thank him for, as the Court has detailed.

As bad as all of this is, it does not directly assist Dekelaita in his section 2255 motion. There is no evidence that agent Chesla's post-trial actions involving Jabo-Cordova, as distasteful as they were, had been part of any pretrial or during-trial understanding with her. Agent Chesla's willingness to help the client-witnesses post-trial is not reasonably understood, based on the evidence, as including a tacit understanding that he would later support or look the other way on a false application for immigration-related benefits. In other words, the Court cannot and does not find that there was a *pretrial understanding* that Chesla or OIG would assist or condone a false application for immigration benefits. It's much more likely that what happened was that, after Dekelaita's trial or after his appeal, agent Chesla was willing to look the other way in light of the significant amount of assistance and cooperation that Jabo-Cordova had provided to law enforcement.

---

[11] There was one additional way in which Chesla assisted in expediting the process: when Jabo-Cordova's "name check" with the FBI—a necessary step before I-485 approval—appeared to be delayed, Chesla contacted the FBI unit chief to bring the matter to the unit chief's attention.

**Discussion**

Under 28 U.S.C. § 2255, a court may vacate, set aside, or correct a sentence imposed in violation of the laws of the United States or otherwise subject to collateral attack.  28 U.S.C. § 2255(a).  Such relief is appropriate "only for an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently resulted in the complete miscarriage of justice."  *Harris v. United States*, 366 F.3d 593, 594 (7th Cir. 2004) (internal quotation marks omitted).

Dekelaita's claim arises under the Fifth Amendment and the Supreme Court's rulings in *Napue v. Illinois*, 360 U.S. 264 (1959), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).  In *Napue*, the Supreme Court held that it is a violation of the Due Process Clause for the government to solicit or permit false evidence to be presented to the jury—even if the evidence "goes only to the credibility of the witness."  *See Napue*, 360 U.S. at 269; *see also United States v. Cosby*, 924 F.3d 329, 336 (7th Cir. 2019) (stating the applicable standard).  *Brady* stands for the proposition that the government's failure to make available "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.  In *Giglio*, the Supreme Court extended *Brady* to circumstances where the government promises benefits to a witness but fails to disclose those benefits to opposing counsel or the jury.  *See Giglio*, 405 U.S. at 154-55; *see also Abbott v. United States*, 195 F.3d 946, 948 (7th Cir. 1999) (stating the applicable standard).

The Court begins with Dekelaita's *Napue* claim.  He contends that the client-

26

witnesses testified falsely when they said no promises had been made to them regarding their future immigration status.  In order for the Court to sustain this claim, Dekelaita must show that the government presented false testimony during his trial; knew or should have known of the perjury; and it was material, that is, it is likely that the false testimony affected the jury's verdict.  *Napue*, 360 U.S. at 269; *Simental v. Matrisciano*, 363 F.3d 607, 615 (7th Cir. 2004).

The Court overrules Dekelaita's *Napue* claim.  It founders on the very first element.  Dekelaita has not shown that the witnesses' testimony that they had been given no promises about their future immigration status was false.  As the Court has found, Dekelaita has not established that any promises were made about the witnesses' future status.

Next is the *Brady* claim, which, as should be apparent, is interrelated to some extent with the *Napue* claim.  Dekelaita's primary contention is that the client-witnesses, or at least some of them, were promised continued legal status or at least the ability to remain in the U.S. going forward, and that this was not disclosed to him.

The client-witnesses, all of whom admitted under oath that they obtained immigration benefits by fraud, all remained in the United States as of five years after Dekelaita's trial.  And at least as of the date briefing in this case was completed (late March 2021), there was no indication that immigration authorities had even taken any steps to initiate proceedings to deport them or to revoke their legal status.  It's certainly plausible for one to believe, as Dekelaita contends, that this was the product of an earlier promise or design.  As previously discussed, however, the Court finds that their continued presence in the U.S. is not the result of an earlier promise, understanding, or

common design.  Rather, it has resulted from bureaucratic inaction and delay, aided in part by the fact that agent Chesla has continued to maintain physical possession of the client-witnesses' A files and did not complete the documentation of their fraud.  None of that, however, was promised or hinted at, even implicitly, prior to Dekelaita's trial, and the Court so finds.  The witnesses all no doubt *hoped* that they would be able to remain here, and it's overwhelmingly likely that they all believed or at least hoped that their cooperation would serve them well in this regard.  But that falls short of an understanding.  "[W]hat one party might expect from another does not amount to an agreement between them.  . . .  Without an agreement, no evidence was suppressed, and the [government's] conduct, not disclosing something it did not have, cannot be considered a *Brady* violation."  *Wisehart v. Davis*, 408 F.3d 321, 325 (7th Cir. 2005).

That aside, the evidence unquestionably shows that the OIG agents (mainly agent Chesla) provided aid, assistance, and advice to the client-witnesses after the trial.  Agent Chesla has accepted and listened to their inquiries and requests for assistance; he has followed up and even advocated on their behalf other immigration officers and officials; and he has assisted at least some of the client-witnesses in attempting to secure further immigration benefits.  He has done so in some instances without letting on to the responsible officials that the client-witnesses were seeking to extend or retain immigration benefits that they admittedly obtained by fraud.  And agent Chesla has done all of this not because—as he attempted without credibility to maintain—it's part of his ordinary duties or something he would do for anyone, but instead to further reward the client-witnesses for their assistance in the Dekelaita investigation.

The evidence also shows that agent Chesla rendered assistance to one

applicant, Rafida Jabo-Cordova, in connection with what amounts to an attempt, ultimately successful, to obtain immigration benefits by a further, post-trial fraud. As the Court has found, in doing so agent Chesla was aware that false statements were going to be presented but chose to look the other way. Jabo-Cordova, who to be sure rendered significant assistance to the government and to OIG in connection with Dekelaita's case and other investigations, has been amply rewarded for her efforts.

There is nothing legally or ethically wrong with the OIG agents assisting the cooperating witnesses in an appropriate way post-trial[12] to forestall their removal from the U.S., as a reward for cooperation with law enforcement. Even though the witnesses obtained their entitlement to remain in the U.S. by committing fraud, a case can be made that their cooperation in the prosecution of Dekelaita—who was convicted of orchestrating the fraud—*earned* them the benefit of staying in this country despite their admitted frauds. But the main issue here is whether, before Dekelaita's trial, the client-witnesses were promised any particular benefit or assistance. If not, there was no violation of Dekelaita's rights. "The government is free to reward witnesses for their cooperation with favorable treatment . . . without disclosing to the defendant its intention to do so, *provided* that it does not promise anything to the witnesses prior to their testimony." *Wisehart*, 408 F.3d at 325 (citation omitted).

There is good reason to believe—coming from agent Chesla himself—that it was always his intention to provide assistance to the witnesses after Dekelaita's trial. Here's his testimony given in connection with the timing of his post-trial assistance to Jabo-

---

[12] "Appropriate ways" obviously does not include the episode involving Jabo-Cordova's I-601 and I-485 applications discussed above.

Cordova:

> Q:  What changed after the appeal to cause you to decide to help Ms. Jabo-Cordova or in doing any of the follow-up actions that you took for the other trial witnesses?
>
> A.  Because before trial and even afterwards, our normal course of action with any appeal pending until the case is closed on our end, we don't offer, say we're going to do anything or help anybody in any way in case there is, you know, another trial, and that would be more things to disclose.  It's just better to keep everybody -- you know, everybody's -- I don't want to say "in the dark," but we don't really discuss it with them.

Hearing Tr. 767.

It's one thing, however, to intend something, and another to make that intention known.  As the Court has found, the evidence does not support a finding that the client-witnesses, or any of them, had any understanding or promise (express or tacit) *before trial* regarding any particular steps that the OIG agents would take on their behalf or that any particular outcome would be obtained.  There was no pretrial understanding that the agents would stall their deportation, that the agents or other authorities would enable them to stay in the U.S. indefinitely or even for any significant period, or that the witnesses would receive any actual consideration from immigration authorities regarding their status.  So the fact that the government did not disclose this is of no consequence; it was not obligated to disclose promises that were not made.

On the other hand, the evidence *does* show, and the Court finds, that the client-witnesses knew they could reach out to the OIG agents for assistance after the trial—and that the agents—at least, agent Chesla—had told them as much.  Specifically, the evidence shows that Chesla made it clear to the client-witnesses that they could contact him going forward if any immigration issues came up, with an implicit offer to assist.  The Court does not believe that it was simply happenstance that the witnesses

discussed in this opinion reached out to OIG and Chesla when they had problems. As the Court has discussed, the witnesses not only knew to reach out to the OIG agents; they knew how to reach the agents, and they were comfortable doing so even though the agents had investigated them for fraud. This and other evidence discussed earlier tends to show—and the Court finds—that the agents (at least agent Chesla) had given the witnesses contact information and had made it apparent that they could reach out for help. In short, the Court finds that before and at the time of Dekelaita's trial, the client-witnesses had a mutual understanding with the OIG agents that they would be available for assistance. As indicated, this understanding did not include any guarantee, promise, or representation regarding any results. What the witnesses had was an assurance that they have an "insider" available and willing to help them on immigration-related matters. And this was not disclosed to Dekelaita by the agents before or during his trial, nor was it otherwise known or readily available to him.

The Court notes that there's not a bit of evidence that the prosecutors were aware of this understanding, but that doesn't matter: the government's disclosure obligations under *Brady* apply even if the evidence is known only to law enforcement agents. *See Kyles v. Whitley*, 514 U.S. 419, 438 (1995). So there was a promise of a benefit, and it was undisclosed. This leaves the question of materiality: a new trial is required if the defendant shows a reasonable likelihood that the outcome of the trial would have been different but for the error. *See, e.g., United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.), 685 (opinion of White, J.).

The Court concludes that Dekelaita has not shown that the undisclosed promise of assistance is material. As the government has argued, *see* Gov't Post-Hearing

Mem. at 25, significant evidence entirely unrelated to the credibility of the client-witnesses supported the verdict. This includes, among other things, the testimony of Adam Benjamin, an interpreter also involved in the fraudulent activity; Adam Takhsh, an attorney who testified that he told Dekelaita about Benjamin's false transactions; and the recorded conversation between Jabo-Cordova and Dekelaita, in which he directed Jabo-Cordova to lie and conceal and to obtain false evidence to support her asylum application.

In addition, there was plenty of evidence that *was* submitted at the trial to impeach the client-witnesses. The defense cross-examined multiple witnesses about their desire to remain in the U.S. and the fact that their ability to do so was largely in the hands of the government. In addition, some of the witnesses, including Jabo-Cordova, were examined regarding benefits they had already gotten (for Jabo-Cordova, authorization to work in the U.S.).

What was *not* disclosed and thus unavailable to the defense for cross-examination was the fact that the client-witnesses understood that they could reach out to the OIG agents for assistance on immigration-related issues. The Court is not persuaded that Dekelaita has shown that this is material, in other words that disclosure of this (and the resulting ability to cross-examine about it) is reasonably likely to have made a difference in the outcome of Dekelaita's trial. This evidence is to a significant extent cumulative with respect to the credibility of each of the client-witnesses, whose credibility was significantly impeached in other ways. In addition, the promise did not involve an actual tangible benefit for any of the client-witnesses, but rather an offer of assistance (from an insider, to be sure) without any promise, implicit or otherwise, of a

favorable outcome.

For these reasons, the Court overrules Dekelaita's *Brady* claim.

Finally, Dekelaita asks the Court to vacate his conviction under its supervisory authority, arguing that the agents committed flagrant misconduct that is appropriately considered outrageous and that caused him substantial prejudice. The Seventh Circuit has made it clear, however, that "outrageous conduct" by investigating agents is not a defense to criminal responsibility. *See, e.g., United States v. Westmoreland*, 712 F.3d 1066, 1071 (7th Cir. 2013); *United States v. Stallworth*, 656 F.3d 721, 730 (7th Cir. 2011). And that aside, Dekelaita has not shown that he was prejudiced, as discussed in the previous section of his opinion (regarding materiality under *Brady*.

## Conclusion

For the reasons stated above, the Court directs the Clerk to enter judgment denying defendant Robert Dekelaita's motion under 28 U.S.C. § 2255. The Court does, however, issue a certificate of appealability, because the issues presented in the case are fairly debatable and capable of a different resolution. *See* 28 U.S.C. §2253(c)(2).

Date: September 22, 2022

MATTHEW F. KENNELLY
United States District Judge